

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Harry D. Leinenweber | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 5830 | **DATE** | 12/23/2004 |
| **CASE TITLE** | Sharon Williams vs. Lynch Ford, Inc., et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Lynch Ford's Motion for Summary Judgment is GRANTED in Part and DENIED in Part as Moot. Americredit's Motion for Summary Judgment is DENIED as Moot. Williams' Motion to Strike and for Class Certification are DENIED as Moot. All remaining state law claims and counterclaims are Dismissed without Prejudice.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | DEC 2 3 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | 84 |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| WAP | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice | mailing deputy initials |

**FILED**

DEC 2 3 2004

JUDGE HARRY D. LEINENWEBER
U.S. DISTRICT COURT JUDGE

**DOCKETED**
DEC 2 3 2004

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SHARON WILLIAMS,

                    Plaintiff,

         v.

LYNCH FORD, INC., d/b/a LYNCH
AUTO GROUP, and AMERICREDIT
FINANCIALS SERVICES, INC.,

                    Defendants.

Case No. 03 C 5830

Hon. Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Sharon Williams (hereinafter, "Williams"), a disgruntled customer, filed this lawsuit for damages, injunctive and declaratory relief against Lynch Ford, Inc. (hereinafter, "Lynch Ford"), an automobile dealer, and Americredit Financial Services, Inc. (hereinafter, "Americredit"), an assignee of a retail installment contract allegedly executed by Williams for the purchase of a new 2002 Ford Explorer automobile (the "Explorer"). Williams claims that Lynch Ford violated the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* (the "TILA"), the Illinois Consumer Fraud Act, 815 ILCS 505/2, and committed common law fraud. She claims that Americredit violated the Illinois Commercial Code, 810 ILCS 5/2-717 and defamed her. Before the Court are Lynch Ford and Americredit's Motions for Summary Judgment, as well as Williams' Motions to Strike and for Class Certification.



# I. BACKGROUND

This case arises from Williams' visit to Lynch Ford on her way home from work on August 20, 2002. Williams wanted to purchase or lease a new vehicle because the lease on her car was about to expire. She test drove the Explorer and expressed a desire to purchase it. She advised the salesman that she did not want to increase her then current payment of $449 per month. The salesman initially suggested a different automobile but Williams reaffirmed her desire to purchase the Explorer.

After deciding to purchase the Explorer, Williams met with a finance manager who prepared a Vehicle Purchase Order disclosing a cash price for the Explorer of $24,200 (the "VPO"). (Lynch Ford, Ex. 2). The VPO also disclosed that Williams was to pay $2,500 "cash down" and was to be given $3,000 as an "incentive." *Id.* The bottom of the VPO discloses that there is an "UNPAID BALANCE: 20,789.29." Williams admits that she signed the VPO. (Pl. Resp. to Lynch Ford, ¶ 35).

Williams gave Lynch Ford $100 cash as a down payment, as well as two checks totaling $2,400 dated August 20, 2002. (Lynch Ford, Ex. 10). Williams also signed a promissory note for $2,400, with no interest due if it was repaid before September 10, 2002. (Lynch Ford, Ex. 4). Williams additionally signed a Guaranteed Auto Protection Agreement (the "GAP")(Lynch Ford, Ex. 5), an Extended Warranty Agreement with OmniCare (Lynch Ford, Ex. 6, 7), a Delivery

Checklist (Lynch Ford, Ex. 8), and an Odometer Disclosure Statement (Lynch Ford, Ex. 9).

Because Williams needed to finance the Explorer, she also executed at least two Retail Installment Contracts (the "RICs"). Williams admits that at least one of the RICs was already filled in with information when she signed it including the Annual Percentage Rate (the "APR") of 18.15%, the Amount Financed of $22,279.29, and 72 monthly payments of more than $500 starting on 10/04/2002. One of the RICs signed by Williams disclosed a Finance Charge of $14,702.37 and a monthly payment of $513.63, and was ultimately assigned to Americredit (the "Assigned RIC"). (Lynch Ford, Ex. 1). The second RIC signed by Williams also disclosed an APR of 18.15%, with the same amount financed of $22,279.29, but disclosed a slightly larger Finance Charge of $14,720.07 and monthly charge of $513.88 (the "Unassigned RIC"). (Lynch Ford, Ex. 1A). The Assigned and Unassigned RICs also had identical disclosures regarding the following: Cash Price: $24,200.00; Cash Down payment: $5,500.00; no trade-in; no insurance companies; GAP/Resource: $495.00; Public Officials (Licenses, Title & Taxes): $2,037.89; Doc Fee: $51.40; Omni Care: $995.00. (Lynch Ford, Ex. 1 & 1A). The only differences in the financial disclosures of two RICS were that the Assigned RIC had a $0.25 *lower* monthly payment and roughly $18 *lower* total Amount Financed (and resulting Total Payments and Sale Price) than the Unassigned RIC.

Lynch Ford argues that Williams only signed two RICs, the Assigned and Unassigned RICs, and both contracts had the financial information already filled in prior to her signature. Williams contends she signed a total of three RICs at Lynch Ford, one which already had information filled in prior to signing and two that were blank (*i.e.*, no blanks filled in). During her deposition, Williams admitted that she signed the completed Assigned RIC, and acknowledged that she understood its terms, stating:

> Q.   . . . Were all these numbers and letters typed in the blanks as they appear on [the Assigned Contract] at the time you signed it?
>
> A.   Yes.
>
> . . .
>
> Q.   . . . At the time you signed it, you knew that it contained an interest rate of 18.15 percent?
>
> A.   Yes.
>
> Q.   Okay. And you also knew all the other numbers were in the boxes that they were in at the time you signed it; isn't that correct?
>
> A.   Yes.
>
> Q.   Okay. And do you understand what the next box is, the finance charge? Do you understand what that box represents?
>
> A.   Yes.
>
> . . .
>
> Q.   Okay. And the next box, amount financed, did you understand what that represented, that $22,279.99?

A. Yes.

Q. Okay. What did you understand that to mean?

A. I understood that to be the price of the vehicle.

Q. Okay. And then the next column stays a total of payments, $36,981.36. What did you understand that to be?

A. Finance charge plus the vehicle.

(Dep. at 17-19).

Later in the deposition, Williams seemed confused and testified that although she signed both the Assigned and Unassigned RICs, only one was filled in at the time of her signature (the Assigned RIC) and the Unassigned RIC was blank. *See id.* at 22-23. Williams later admitted, however, that she signed her name on the Unassigned RIC in a way so as to avoid the date that was written on it. *See id.* at 23. (Williams subsequently submitted a certification directly contradicting her deposition testimony. For the reasons discussed in Section II herein, the Court disregards the certification.)

Williams also contends that she told the finance manager that she did not want to pay more than an 11 to 13% APR and was assured that this would be the case. Williams contends that the 18.15% APR figure was merely used to solicit bids from financing agencies. Because it was too late in the day to arrange financing, Williams was allowed to drive the Explorer home with her. Williams left her old vehicle at Lynch Ford. The next day Lynch Ford contacted six

financial institutions attempting to obtain financing for Williams. (Mayuga Aff., ¶ 38). Lynch Ford eventually arranged financing with Americredit which had the best rate, and assigned the Assigned RIC to it.

On August 22, 2002, Williams contacted Lynch Ford to find out whether financing had been obtained. She was informed by the finance manager that it had not but that she need not worry. She told him that she wanted to return the vehicle but was told that she could not. Williams stopped payment on the two checks that she had previously given Lynch Ford. (Lynch Ford, Ex. 10). Two days later, Williams obtained counsel who prepared and served a "revocation" on Lynch Ford. She returned to Lynch Ford and left the Explorer on its premises and removed her old car. The same day Lynch Ford returned the Explorer to Williams' home and parked it in front of Williams' house. The Explorer remained in front of Williams' house for approximately two months until the City of Markham towed it away.

Williams contends that she first learned of Americredit when she received a letter advising that her payment was overdue. Eventually Americredit obtained possession of the Explorer and sold it for arrearage. Americredit sold the Explorer on February 18, 2003 at a deficiency of $12,706.36.

## II.  **LEGAL STANDARD**

Williams asserts one claim for violation of the TILA against Lynch Ford.  The TILA was enacted "to assure meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various terms available to him and to avoid the uninformed use of credit and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a).  The TILA is a disclosure statute and does not "substantively regulate consumer credit." *Rendler v. Corus Bank*, 272 F.3d 992, 996 (7th Cir. 2001).  The TILA mandates that all retail installment contracts provide accurate disclosures.  *See Janikowski v. Lynch Ford, Inc.*, 210 F.3d 765, 767 (7th Cir. 2000). Creditors must, in writing, clearly and accurately disclose to consumers the cost of credit, including all finance charges. 15 U.S.C. § 1605, 1638, 1632; 12 C.F.R. § 226.18 (2004).  The disclosures must "'reflect the terms of the legal obligation of the parties' and must be given before the 'consumer becomes contractually obligated on a credit transaction.'" *Janikowski,* 210 F.3d at 767 (citing 12 C.F.R. § 226.17(c)(1); 15 U.S.C. § 1638(c)). This court has additionally stated that automobile dealers and other creditors shall be held liable for violating the TILA "only for defects that are apparent on the face of the disclosure statement." *Cemail v. Viking Dodge, Inc.*, 982 F.Supp 1296, 1300 (N.D. Ill. 1997).

## III. **DISCUSSION**

In Count I, which is against Lynch Ford only, Williams argues that Lynch Ford violated the TILA by incorrectly disclosing and including certain items in the amount financed, and failing to disclose the cost of credit in violation of the TILA. This is Williams' only federal claim.

Before turning to the TILA claim, the Court must address two preliminary matters. First, Williams submitted a non-notarized "certification" in opposition to Lynch Ford's Motion for Summary Judgment purporting to explain her earlier deposition testimony. (Resp. to Lynch Ford, Ex. 7). The certification states it was written under penalty of perjury, and accordingly, the Court will take notice of it. In the certification, Williams asserts that the Assigned Contract was blank when she signed it, and the Unassigned Contract had been already filled in when she signed it. *See id.* ¶ 1-3. This directly contradicts Williams' earlier deposition testimony, where she testified that the Assigned Contract had already been filled in with information prior to the time she signed it. Although Williams claims that she corrected her testimony later in the deposition, the transcript shows that Williams never rebutted or recanted her testimony that she had in fact executed the filled in Assigned Contract. Rather, Williams testified that the Unassigned Contract had been blank when she signed it, but she admitted upon questioning that she signed her

name in a way to avoid the date which was typed onto the form. This is significant because it is effectively an admission that the Unassigned RIC was not truly blank at the time Williams signed it.

The general rule in this Circuit is that a party cannot "create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony." *Kalis v. Colgate-Palmolive Co.*, 231 F.3d 1049, 1056 (7th Cir. 2000), quoting *Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 292 (7th Cir. 1996). There are only narrow exceptions to this well-established rule, such as for newly discovered evidence or to clarify ambiguous or confusing deposition testimony. *See Adelman-Tremblay v. Jewel Co., Inc.*, 859 F.2d 517, 520-21 (7th Cir. 1988). As cited in Section I of this Memorandum, Williams' deposition testimony was perfectly clear and unambiguous that the Assigned Contract was already filled in with the financial disclosures prior to the time she signed it and she understood such terms. There is no allegation of newly discovered evidence. Here, Williams claims only that she was confused when she saw the two contracts in the deposition. Williams admitted under oath, however, that she knew and understood the Total of Payments in the Assigned Contract was $36,981.36, which differed from the terms of the Unassigned Contract. Furthermore, Williams' purported certification explanation was proffered two months after the conclusion of the deposition, and executed just two days before she filed her

response to Lynch Ford's Rule 56.1 Statement. Finally, Williams presented no evidence of any blank RICs, and she admitted to signing at least one filled in RIC that contained the exact financial disclosures that she alleges violated the TILA (same Amount Financed; same down payment; same Document Fee, OmniCare, and GAP inclusions and disclosures, and the same 18.15% APR cost of credit). Thus, the Court concludes that the certification is a clear attempt to create impermissibly an issue of fact to defeat summary judgment. For these reasons, the Court disregards Williams' certification as in conflict with her prior sworn testimony. *See Kalis*, 231 F.3d at 1056.

As a second preliminary matter, the Court notes that Williams attempts to raise new arguments/claims in her opposition briefs that were not raised in her Complaint (*i.e.*, TILA violation for the timing of the disclosures). "A plaintiff cannot create a genuine issue of material fact, thereby precluding summary judgment, by raising facts for the first time in response to defendant's motion for summary judgment which were not raised in the complaint." *Bassiouni v. Central Intelligence Agency*, 2004 WL 1125919, *8 (N.D. Ill. 2004)(and citations therein). Similarly, a plaintiff "may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996). In this case, the Court provided Williams with numerous opportunities to amend her Complaint, and

she has taken advantage of those opportunities. The Court concludes that the new claims and arguments in her opposition briefs are an attempt impermissibly to amend the Complaint to defeat summary judgment, and accordingly, the Court restricts its analysis to the TILA allegations contained in Williams' Complaint.

The Court now turns to Williams' TILA claim.

## A. Amount Financed

Under the TILA, the "amount financed" is the amount of credit of which the purchaser has actual use. See 15 U.S.C. § 1638(a)(2)(A). The TILA disclosure must include a separate itemization of the amount financed. The amount financed is computed by taking the cash price less any down payment, and adding charges which are "not part of the finance charge or of the principal amount of the loan and which are financed by the consumer, including the cost of any items excluded from the finance charge under Section 1605." See id. The down payment is further defined in Regulation Z as an amount

> paid to a seller to reduce the cash price of goods or services purchased in a credit sale transaction. A deferred portion of a down payment may be treated as part of the down payment if it is payable not less than the due date of the second otherwise regularly scheduled payment and is not subject to a finance charge.

12 C.F.R. § 226.2(a)(18).

The Court initially notes that Williams admits that she signed at least one RIC that contained a disclosure of the amount financed as $22,279.29 at the time she signed it. The RIC discloses the

cash price of the Explorer as $24,200, the cash down payment as $5,500, and the resulting cash price of the Explorer to $18,700. Williams initially contends that Lynch Ford improperly disclosed the down payment in violation of the TILA. Williams argues that she only provided a down payment of $100, or at best $2,500. Thus, by disclosing a down payment of $5,500, Lynch Ford falsely inflated the cash price and cash down payment of the Explorer. Lynch Ford responds that the $2,400 was a deferred down payment under the terms of the TILA and was properly disclosed. Further, Lynch Ford contends that the $3,000 incentive was properly disclosed as part of the Williams' down payment because it was a discount.

### 1. Down Payment

It is undisputed that Williams gave Lynch Ford a $100 cash down payment, as well as two checks totaling $2,400 dated August 20, 2002. It is also undisputed that Williams executed a promissory note on the same date to guarantee the $2,400 down payment. The promissory note provided that no interest would become due unless it was unpaid by September 20, 2002, nearly a month after the transaction. Lynch Ford contends that Williams provided it with two checks for the express purpose of being deposited before September 20, 2002.

The Court agrees. The $2,400 was the second portion of the down payment made by Williams. The parties' intent to cash the checks prior to September 20, 2002 was demonstrated by the fact

that Williams dated both checks with the date of the transaction, and did not postdate the checks. Consequently, there was no interest on the promissory note, and the $2,400 portion of the down payment was to be repaid by Williams well before the due date of the second otherwise regularly scheduled payment (the first scheduled payment was not until October 4, 2002). Accordingly, the Court concludes that the $2,400 deferred portion was properly treated by Lynch Ford as part of the down payment. *See* 12 C.F.R. § 226.2(a)(18).

Lynch Ford also contends that it properly included the $3,000 incentive credit as part of Williams' down payment because it was a discount to induce her purchase. Under Regulation Z, discounts "offered to induce payment for a purchase by cash, check or other means" are excluded from the finance charge and are not finance charges under the TILA. *See id.* § 226.2(c)(8). Here, the $3,000 was an incentive, or discount, offered by Lynch Ford to induce Williams to purchase the Explorer. The VPO clearly discloses the $3,000 discount as an "incentive." The computation of the down payment need not be disclosed. *See* 15 U.S.C. § 1638(a)(2)(A). Thus, the incentive was not a finance charge and did not need to be separately listed. Williams does not refer to, and the Court's research does not reveal, a TILA provision that prohibits the inclusion of a discount such as the one present here as part of the down payment disclosed on the face of a RIC. Accordingly, Lynch

Ford's disclosure of the $3,000 incentive discount as part of Williams' down payment did not violate the TILA.

## 2. Inclusions in Amount Financed

Williams alleges that Lynch Ford violated the TILA by "asserting sales tax on items such at [sic] the documentary fee and insurance services, which are not taxable and [sic] charging financing on that amount." Lynch Ford responds that it properly disclosed these costs on the face of the RIC and included such costs in the amount financed.

The RIC clearly discloses a $495.90 "GAP/RESOURCE" fee, a $51.40 "DOC FEE," and a $995.00 "To OMNI CARE" fee on its face. GAP fees are included in the debt cancellation fees category. Under 12 C.F.R. 226.4(d)(1), debt cancellation fees (GAP fees) may be excluded from the finance charge and added to the amount financed if proper disclosures are made. Here, the GAP agreement, signed by Williams, discloses the enrollment fee and specifies in writing that coverage is not required:

> Borrower/lessee further understands that this Addendum is *not required* in order to obtain financing or to purchase the vehicle. You acknowledge that your participation in this GAP Program is *voluntary* and not a condition of the installment sale contract/loan/lease.

(Lynch Ford, Ex. 5)(emphasis added). Accordingly, Lynch Ford's GAP fee disclosure did not violate the TILA.

As to the extended warranty disclosure, Lynch Ford clearly disclosed a charge to OMNICARE in the amount of $995.00. In the

Complaint, Williams alleges that Lynch Ford violated the TILA requirements by including the warranty payment in the amount financed -- presumably an impermissible finance charge allegation. Williams does not allege, or provide evidence to suggest, that Lynch Ford improperly retained a portion of such funds without adequate disclosure or charged a higher price to credit consumers than cash consumers for the such warranty.

The commentary to Regulation Z provides that "charges for a service policy . . . offered to or required or both cash and credit customers for the same price" are not finance charges. 12 C.F.R. 226.4(a)(1)(D), Supp. 1. In *Marshall v. Webb Chevrolet, Inc.*, 2002 WL 1285061, *4 (N.D. Ill. 2002), the court considered a TILA claim based upon the alleged improper disclosure of a service contract (warranty) and documentary fee in a RIC under the "other charges" section of the RIC. In evaluating the claim, the court stated, "Regulation Z, 12 C.F.R. §§ 226.18(b)-(d) requires disclosure of the charge for the service contract and documentary fee either *as part of the amount financed* or as finance charges paid to other persons on the customer's behalf." *Id.* at *5 (emphasis added). The court concluded that the auto dealer's disclosure of such fees in the "other charges" section complied with TILA disclosure requirements. Additionally, in *Cornist v. B.J.T. Auto Sales, Inc.*, 272 F.3d 322, 331 (6th Cir. 2001), the Sixth Circuit affirmed summary judgment in favor of a defendant automobile dealer on the

plaintiff's claim that the service agreement fee, disclosed as "Paid to Doc Fee," was an undisclosed finance charge in violation of the TILA. In so holding, the Sixth Circuit noted that the plaintiff pointed to no evidence that cash purchasers were not charged the service fee and held that "the service agreement appears to be more of an option, which credit or cash customers can either select or decline." *Id.* at 331.

Here, Williams executed an OMNICARE extended warranty agreement that states "THE PURCHASE OF A VEHICLE SERVICES CONTRACT IS NOT REQUIRED IN ORDER TO LEASE OR PURCHASE A MOTOR VEHICLE." (Lynch Ford, Ex. 7). Williams does not allege or point to evidence to suggest that Lynch Ford does not offer the extended warranty, like a service policy, to cash customers for the same price. Accordingly, the Court concludes that Lynch Ford did not violate the TILA disclosure requirements in connection with its OMNICARE disclosure.

Finally, Lynch Ford maintains that it was permitted to charge a document fee and that it properly disclosed such fee, citing *Cornist*. In *Cornist*, the Sixth Circuit noted that the district court granted summary judgment in favor of defendant after concluding that the document fee was not a finance charge because it was a "charge[] absorbed by the creditor as the costs of doing business." Cornist, 272 F.3d at 329-32. The Sixth Circuit upheld summary judgment in favor of Defendant after concluding that no

genuine issue of fact existed with respect to whether the document fee was assessed as an extension of credit, holding that the document fee was not an undisclosed finance charge. *See id. at 332; see also Alston v. Crown Auto, Inc.*, 224 F.3d 332, 334 (4th Cir. 2000)(holding that a $58 processing fee was not a "finance charge" because there was no evidence it was not charged to all customers alike).

Here, Williams does not allege that the document fee was only charged to individuals seeking credit, or that the fee was higher for consumers seeking credit. Rather, Williams appears to object merely to the imposition of any such fee whatsoever. The case precedent suggests that Lynch Ford was entitled to assess a reasonable document fee cost as long as such fee was not assessed as an extension of credit. Williams did not pay such fee out-of-pocket and thus it was part of the amount that she financed. Without an allegation or evidence that Lynch Ford imposed the document fee unfairly or only to credit consumers, the Court concludes that Lynch Ford properly disclosed such fee.

Finally, in the Complaint, Williams raises a potential tax issue apparently based upon Lynch Ford's inclusion of the document fee and insurance services. Here, the RIC clearly discloses as a separate line-item the amount paid to Public Officials for Licenses, Title and Taxes in the amount of $2,307.89. "Taxes and fees prescribed by law that actually are or will be paid to public

officials" are excluded as finance charges under the TILA. *See* 12 C.F.R. 226.4(e)(1). Williams has not provided any case precedent or statutory support for the proposition that Lynch Ford's disclosure with respect to such items violates the TILA.

In her opposition brief, Williams appears to have changed her improper tax disclosure argument. She now argues that due to the $3,000 incentive, Lynch Ford should have taxed the Explorer based on the cash price of $21,850.29 rather than $24,251.40 (the disclosed cash price plus the document fee). The VPO and RIC clearly disclosed the cash price of the car as $24,200, and the VPO clearly disclosed the $3,000 as an incentive. The Court has already concluded that for TILA disclosure purposes, Lynch Ford did not violate the act by including the incentive discount as part of the down payment. If, in fact, Lynch Ford improperly assessed the taxes, Williams may have a recourse under state law. The new alleged tax issue raised by Williams is not apparent on the face of the disclosure statement, and, therefore, is not the proper subject for TILA liability. *See Cemail v. Viking Dodge, Inc.*, 982 F. Supp. 1296, 1300 (N.D. Ill. 1997)(in a blank contract allegation case, holding that the difference between the purported promised price and documented price was not apparent on the face of the disclosure statement and not a violation of the TILA). Accordingly, the Court concludes that Williams has not asserted a claim for violation of

TILA in connection with Lynch Ford's disclosure of applicable taxes.

## B. Cost of Credit

Williams states in the last paragraph of Claim I that the "true cost of credit was never disclosed to Plaintiff in accordance with the TILA and therefore, Plaintiff is entitled to damages pursuant to 15 U.S.C. § 1640 and recession of the deal." Williams appears to have abandoned this claim in her opposition briefs. Without additional guidance, the Court assumes that Williams is contesting Lynch Ford's disclosure of the 18.15% APR Rate, which is described on the face of the Assigned RIC as "the <u>cost of your credit</u> as a yearly rate." (Lynch Ford, Ex. 1)(emphasis added). Williams testified that she signed a filled in RIC that contained an 18.15% APR, and she understood that the RIC contained such term. Lynch Ford did not violate the TILA in its disclosure of the APR.

If, in fact, Williams' intent was to challenge the disclosed finance charge, defined as the "dollar amount the credit will cost you," the Court similarly concludes that Lynch Ford did not violate the TILA with its disclosure. Williams herself testified during her deposition that she signed the completed Assigned RIC, which disclosed a finance charge of $14,702.07. Interestingly, this finance charge is actually approximately $18 less than the finance charge in the Unassigned RIC, which Williams contends in her Complaint and opposition briefs that she signed in filled in form.

- 19 -

For the foregoing reasons, the Court concludes that Lynch Ford is entitled to summary judgment on Williams' TILA claim.

## C.  Remaining Claims and Motions

The Seventh Circuit admonishes that normally when all federal claims fall out before trial, the district court should relinquish its pendent jurisdiction.  See Graf v. Elgin Joliet & Eastern Ry. Co., 790 F.2d 1341, 1347-48 (7th Cir. 1986).  Accordingly, due to the Court's disposition of the TILA claim, the Court dismisses without prejudice the remaining pendent state law claims without reaching the merits, which includes all claims against Americredit. All other counterclaims are similarly dismissed for the same reasons.

Also, before the Court is Williams' Motion to Strike all references to Lynch Ford's Rule 68 Offer of Judgment.  The Court did not rely on the Offer of Judgment, and accordingly, the Motion to Strike is denied as moot.  Williams also submitted a Motion for Class Certification for Lynch Ford's alleged systematic violation of the Illinois Consumer Fraud Act, 815 ILCS 505/2C.  Due to the Court's disposition of Williams' TILA and state claims, Williams' Motion for Class Certification is denied as moot.

## IV.  CONCLUSION

For the reasons stated herein, Lynch Ford's Motion for Summary Judgment is **GRANTED in Part** and **DENIED in Part as Moot**. Americredit's Motion for Summary Judgment is **DENIED as Moot**.

Williams' Motions to Strike and for Class Certification are **DENIED as Moot.** All remaining state law claims and counterclaims are **Dismissed without Prejudice.**

**IT IS SO ORDERED.**

Harry D. Leinenweber, Judge
United States District Court

Dated: December 23, 2004